UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
U.S. DISTRICT COURT
DISTRICT OF VERMONT
        FILED
    5-30-06
BY
    DEPUTY CLERK
```

Karen Goyette,                        :
        Plaintiff,                    :
                                      :
        v.                            :    File No. 2:05-CV-137
                                      :
Jo Anne B. Barnhart,                  :
Commissioner of Social Security, :
        Defendant.                    :

## OPINION AND ORDER
(Documents 9 & 14)

Claimant Karen Goyette ("Goyette") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying in part her application for social security disability insurance benefits ("DIB").

The case is currently before the Court on Goyette's motion to reverse the Commissioner's decision, and the Commissioner's motion to affirm the decision.

For the reasons set forth below, Goyette's motion to reverse (Doc. 9) is GRANTED and the Commissioner's motion to affirm (Doc. 14) is DENIED.

## PROCEDURAL HISTORY

Goyette applied for DIB on May 2, 1997.  (Tr. 98).  She claimed that she became unable to work on June 5, 1996

because of debilitating fatigue due to chronic Hepatitis C
and depression.  (Tr. 16).  The Social Security
Administration ("SSA") denied her application initially and
on reconsideration.  (Tr. 49, 55).  Goyette requested a
hearing before an Administrative Law Judge ("ALJ"), who
denied her application on October 14, 1998.  (Tr. 25).  The
Appeals Council reviewed the decision and, in an order dated
June 9, 2000, remanded it for further consideration.  (Tr.
288).  The ALJ held another hearing and denied Goyette's
application on August 27, 2001.  (Tr. 291).  The Appeals
Council reviewed the ALJ's second denial and on January 17,
2002 ordered the case be remanded again.  (Tr. 318).
Because the case previously had been remanded to the same
ALJ, the Appeals Council ordered the case to be reassigned
to ALJ Ruth Kleinfeld.  (Tr. 319).  At the hearing, ALJ
Kleinfeld heard testimony from Goyette and her mother.  (Tr.
351).

     In a decision dated March 3, 2003, the ALJ found that
Goyette had not performed any substantial gainful work
activity since her alleged onset date of June 5, 1996.  (Tr.
20).  She further found that Goyette's Hepatitis C and
depression were severe impairments that did not meet or

2

equal one of the listed impairments.  (Tr. 20).  Although
the ALJ found Goyette's testimony not fully credible, she
found that from June 5, 1996 through June 4, 1997, Goyette's
"residual functional capacity for even sedentary work was
significantly diminished."  (Tr. 20).  The ALJ concluded
that after June 4, 1997, Goyette regained the residual
functional capacity ("RFC") to perform her past relevant
work as a telephone secretary.  (Tr. 20).  Therefore, the
ALJ found Goyette disabled for a "closed period" from June
5, 1996 through June 4, 1997.  (Tr. 20).  The Appeals
Council denied Goyette's request for review thereby making
the ALJ's decision the final decision of the Commissioner.
(Tr. 9).

### STANDARD OF REVIEW

In reviewing the Commissioner's decision, the court
must limit its inquiry to a "review [of] the administrative
record *de novo* to determine whether there is substantial
evidence supporting the Commissioner's decision and whether
the Commissioner applied the correct legal standard."
Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); 42
U.S.C. § 405(g).  Substantial evidence is "more than a mere
scintilla.  It means such relevant evidence as a reasonable

3

mind might accept as adequate to support a conclusion."
Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting
Consol. Edison Co. v. NRLB, 305 U.S. 197, 229 (1938)).  Even
if a court could draw different conclusions after an
independent review of the record, the court must uphold the
Commissioner's decision when it stands on substantial
evidence and the proper legal principles have been applied.
42 U.S.C. § 405(g).  "It is the function of the Secretary[1],
not [the reviewing courts], to resolve evidentiary conflicts
and to appraise the credibility of witnesses, including the
claimant.  If the Secretary's findings are supported by
substantial evidence, the court must uphold the ALJ's
decision to discount a claimant's subjective complaints . .
. ."  Aponte v. Sec'y, Dep't of Health and Human Servs. of
the United States, 728 F.2d 588, 591 (2d Cir. 1984) (changes
in original) (quotation marks and citations omitted).  The
court may not substitute its judgment for that of the
Commissioner.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir.

---

[1]Prior to 1995, the SSA was a component of the
Department of Health and Human Services ("HHS").  Final
administrative decisions were issued in the name of the
Secretary of HHS, who was also the named defendant on
appeal.  The SSA became an independent agency in 1995. Since
1995, final administrative decisions are issued by the
Commissioner of the SSA.

1998).

## DISCUSSION

Goyette argues that her disability due to fatigue
continued after June 4, 1997.  She contends that the ALJ
did not properly evaluate her fatigue and its effect on her
ability to do substantial gainful activity.  Specifically,
Goyette argues that the Commissioner did not meet her burden
of showing that Goyette had medically improved because the
ALJ (1) failed to adequately support her adverse credibility
finding, (2) improperly rejected the opinion of Goyette's
treating physicians, and (3) failed to consider lay witness
evidence.  The Commissioner argues that the decision is
supported by substantial evidence.

I.   <u>Disability Standard</u>

A "disabled" individual has "a severe impairment(s)
that makes [her] unable to do [her] past relevant work or
any other substantial gainful work . . . ."  20 C.F.R. §
404.1505(a).  The SSA prescribes five steps to evaluate a
claim for disability benefits.  First, the Commissioner
determines whether the claimant is engaged in substantial
gainful activity.  If the claimant is not engaged in

5

substantial gainful activity, the Commissioner decides if the claimant has a severe impairment.  If the claimant has a severe impairment then the Commissioner proceeds to step three and compares the claimant's impairment to the SSA listings.  If the impairment does not meet or equal a listing, then the Commissioner evaluates the claimant's RFC. At step four, the Commissioner determines whether the claimant's RFC allows her to do her past relevant work.  If the claimant cannot do her past relevant work, then step five requires the Commissioner to determine whether there is any other substantial gainful work in the national economy that the claimant can do.  20 C.F.R. § 404.1520(4)(i)-(v). The claimant carries the burden for steps one through four. The Commissioner carries the burden at step five.  Rivera v. Schweiker, 717 F.2d 719, 722-723 (2d Cir. 1983).

In order to terminate existing benefits, however, the Commissioner has the burden of showing that the claimant has medically improved.  Waters v. Barnhart, 276 F.3d 716, 719 (5th Cir. 2002).  In "closed period" cases where the Commissioner finds the claimant is disabled for a finite period of time, the decision-making process is equivalent to termination cases.  Id.  Hence, several circuits have found

that the "medical improvement standard applies to the cessation date in closed period cases." Id. (citing the Tenth, Seventh, Eleventh and Third Circuits).[2]

To satisfy her burden, the Commissioner must determine whether "there has been any medical improvement in [a claimant's] impairment(s) and, if so, whether this medical improvement is related to [the claimant's] ability to work." Shepherd v. Apfel, 184 F.3d 1196, 1201 (10th Cir. 1999) (quoting 20 C.F.R. § 404.1594(a)) (changes in original). This determination is based on an eight-step review process. 20 C.F.R. § 404.1594(f).  At step one, the Commissioner assesses whether the claimant is engaged in substantial gainful activity. Id. at (f)(1).  If not, the Commissioner determines if the claimant has an impairment or combination of impairments that meets or equals the listings. Id. at (f)(2).  If not, the Commissioner determines whether the claimant's impairment has medically improved. Id. at (f)(3).  If the claimant has medically improved, the Commissioner must then determine if that improvement is related to the claimant's ability to work. Id. at (f)(4).

_____

[2]There is no reported case in the Second Circuit on this issue.  However, since the parties agree that the standard applies to this case, the Court will adopt that standard.

This step requires assessing whether there has been an increase in the claimant's residual functional capacity. If so, the Commissioner then evaluates whether the claimant's current impairments are severe. Id. at (f)(6). If the impairments are severe, the Commissioner determines the claimant's ability to engage in substantial gainful activity by assessing the claimant's current residual functional capacity to do his or her past work. Id. at (f)(7). If the claimant can do such work, the Commissioner will find that the disability has ended. Upon review, the decision to terminate benefits must be supported by substantial evidence. Shepherd, 184 F.3d at 1199 (quoting 42 U.S.C. § 423(f)).

The parties do not dispute that this is a "closed period" case or that the Commissioner applied the correct legal standard. Rather, Goyette contends that the Commissioner's finding that Goyette regained the residual functional capacity to return to her past relevant work is not supported by substantial evidence and therefore falls short of satisfying the Commissioner's burden to prove that Goyette is no longer disabled. More specifically, the issue facing this Court is whether the ALJ properly evaluated

Goyette's fatigue when she decided that Goyette had regained the residual functional capacity to return to her past relevant work.

Residual Functional Capacity

A claimant's RFC is "the most [a claimant] can still do despite" any "physical and mental limitations" caused by the claimant's "impairment(s) and any related symptoms." 20 C.F.R. § 404.1545(a)(1). The RFC determination measures the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," meaning 8 hours a day for 5 days a week. Social Security Ruling ("SSR") 96-8P, *1. This assessment "must be based on all of the relevant evidence in the case record, such as: [1] Medical history, [2] Medical signs and laboratory findings, [3] The effects of treatment . . . [4] Reports of daily activities, [5] Lay evidence, [5] Recorded observations, [6] Medical source statements, [7] Effects of symptoms, [8] Evidence from attempts to work, [9] Need for a structured living environment, and [10] Work evaluations." Id. at *5.

In this case, the ALJ decided that Goyette had regained the residual functional capacity to return to her past

relevant work based on the medical source statements and Goyette's testimony.

## II.   Medical Opinions

Goyette argues that the ALJ improperly rejected Dr. Jeffrey Rubman's opinion.  She claims the ALJ should have deferred to his opinion because he was her treating physician for over ten years.

A treating physician "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502. An ongoing treatment relationship exists "when the medical evidence establishes that [the claimant] sees, or has seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)."  Id. The opinions of treating sources are important because the Commissioner will generally "give more weight to [those] opinions . . . since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) . . . ."  20 C.F.R. § 404.1527(d)(2).  In

10

fact, a treating physician's opinion about the nature and severity of the impairment might be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

In this case, the ALJ concluded that as of June 4, 1997, Goyette had medically improved and regained the residual functional capacity to perform sedentary work. According to the ALJ, "this conclusion is consistent with Dr. Krawitt's statement of March 16, 1998 (Exhibit 14F)." (Tr. 19). Dr. Krawitt treated Goyette for Hepatitis C and stated that treatment made her unable to work until May 29, 1997. The ALJ considered Dr. Jeffrey Rubman's opinion that Goyette was disabled in March 1998, but discounted it because Dr. Rubman did not treat Goyette for liver disease or depression. (Id.). The ALJ also considered and discounted the opinion of Dr. Keller, Goyette's psychiatrist, because he failed to describe Goyette as disabled. (Id.). Therefore, the ALJ gave Dr. Krawitt's opinion greater weight. (Id.).

According to the record, Goyette saw Dr. Rubman in

11

April 1993 for a cough and in December 1993 for a pregnancy test. (Tr. 195). In December 1995, Dr. Rubman referred Goyette to Dr. Krawitt because she had abnormal liver function tests. (Tr. 236). While receiving treatment from Dr. Krawitt, Goyette continued to see Dr. Rubman periodically. In February 1996, she saw him for treatment of pneumonia and a urinary tract infection. (Tr. 195-96). She saw him again in April, May and June of 1996 for coughing, congestion and lung pain. (Tr. 196). In September 1996, Goyette and Dr. Rubman talked about anti-depressant medication. (Tr. 198). Dr. Rubman refilled her prescription for Zoloft in January 1997 and sent her for a mammogram. (Tr. 198). These records suggest that Dr. Rubman was Goyette's general physician and that he referred her to specialists as needed. Hence, from January 1996 until December 1999 she saw Dr. Krawitt for her Hepatitis C and started seeing Dr. Keller in August 1997 for her depression. Despite his long term relationship with Goyette, Dr. Rubman was not actually treating her for the relevant underlying medical impairments. Therefore, the ALJ's decision that Dr. Rubman was not Goyette's treating physician for her liver disease or depression is supported

by substantial evidence.

Nontheless, even though Dr. Rubman was not Goyette's treating physician for her Hepatitis C or depression, the ALJ must still consider Dr. Rubman's opinion regarding Goyette's fatigue. 20 C.F.R. § 404.1527(d). The ALJ must also explain the weight given to that opinion. 20 C.F.R. § 404.1527(f)(2)(ii) ("[T]he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical . . . consultant . . . as [s/he] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources . . . ."). Goyette argues that the ALJ did not properly evaluate the medical evidence regarding the effect of her fatigue.

The weight the ALJ gives to any medical opinion depends on the following factors: "(1) Examining relationship . . . (2) Treatment relationship . . . [3] length of treatment relationship and the frequency of examination . . . [4] Nature and extent of the treatment relationship . . . [5] [R]elevant evidence to support an opinion . . . [6] Consistency . . . [7] Specialization [of practitioner] . . . and [8] Other factors [raised]." 20 C.F.R. §§ 404.1527(d)(2)-(6).

13

Dr. Rubman was Goyette's primary care physician from 1985 until he retired in 2000. (Tr. 287). As indicated above, he saw her routinely and provided on-going medical care before, during and after her Hepatitis C treatment. Goyette completed her Hepatitis C treatment in May 1997. Dr. Rubman reported in March 1998 that she was experiencing disabling fatigue that had been present for two years. (Tr. 276). In March 2000, Dr. Rubman reported that it was too physically demanding for Goyette to work while she was attending school. (Tr. 284). He also reported that Goyette could not do any occasional (up to 2.5 hours per day) or frequent (2.5 to 5 hours per day) lifting or carrying. (Tr. 284). In fact, he indicated that there were no physical activities that she could do occasionally, frequently or constantly. (Tr. 284). After Dr. Rubman retired, Goyette continued treatment with his daughter, Dr. Siegel[3]. According to Dr. Siegel, as of October 2000, Goyette still reported excessive fatigue that interfered with her ability to work while she was in school. (Tr. 281). In June 2001, Dr. Siegel noted that Goyette gets tired after three hours

---

[3]It appears from the records that at some point in 2002, Dr. Amy Rubman changed her name to Dr. Siegel. To avoid confusion, this Court refers to Dr. Amy Rubman as Dr. Siegel at all times.

and that the fatigue might be caused by depression, chronic hepatitis C or chronic fatigue. (Tr. 339). Dr. Siegel confirms this assessment in her July 2001 letter. (Tr. 287). Dr. Siegel's records continue to report Goyette's fatigue through May 2002. (Tr. 340-343). In May 2002, Dr. Siegel reported that Goyette could occasionally lift or carry twenty pounds, and could only stand or walk up to two hours. (Tr. 345). She also reported no limitations in sitting, pushing, pulling, and manipulative or visual and communicative functions. (Tr. 346-47). According to that report, Goyette could also frequently perform all postural activities. (Tr. 346).

In contrast, Dr. Krawitt only treated Goyette's Hepatitis C. She started seeing him in January 1996, began treatment in June 1996, and completed treatment in May 1997. (Tr. 200, 219, 225, 234). She had follow up visits in June, July and August 1997, November 1997, and December 1999. (Tr. 225, 234, 273, 280). Dr. Krawitt reported that the side effects of the chemotherapy, including significant fatigue as well as body aches, nausea, fever and chills, rendered her disabled through May 29, 1997. (Tr. 219, 225, 243, 277). However, even according to Dr. Krawitt's

15

records, Goyette's fatigue, which predated the chemotherapy, persisted after her Hepatitis C was in remission.  (Tr. 225, 234, 273, 280).  In fact, Dr. Krawitt reported Goyette's continuing fatigue in November 1997 and December 1999.  He did not question her fatigue but opined that it might be related to chronic fatigue syndrome or depression because in his opinion it was not related to her Hepatitis C.  (Tr. 273, 280).  He recommended returning in one year to follow up.  (Tr. 280).  Hence, Dr. Krawitt's opinion, as it relates to Goyette's fatigue, is that the fatigue persists despite remission and might be caused by depression or chronic fatigue syndrome.  This opinion is consistent with Dr. Rubman's opinion.

In light of this record and the relevant factors, the ALJ's decision to discount Dr. Rubman's longitudinal perspective of Goyette's fatigue simply because he was not the primary treating specialist for her Hepatitis C or depression is not supported by substantial evidence.

The ALJ also discounted the opinion of Dr. Keller, Goyette's psychiatrist, because he "did not describe the claimant as disabled in his letter of March 17, 1998."  (Tr. 19).  While Dr. Keller did not explicitly opine that Goyette

16

was disabled, he reported that she is under his care for major depression. (Tr. 278). Moreover, the gravamen of that letter is to clarify that Goyette's past substance abuse problem is not a factor in her present condition. (Id.). The other reports from Dr. Keller spanning from August 1997 until November 1997 all reference Goyette's continued feelings of fatigue, low energy and sedation. (Tr. 264, 269, 271). These reports of fatigue are consistent with those of Dr. Krawitt and Dr. Rubman.

Overall, the ALJ seems to have relied exclusively on Dr. Krawitt's evaluation to determine that Goyette's period of disability closed at the end of her Hepatitis C treatment. However, despite being in remission for Hepatitis C, even Dr. Krawitt's records show that Goyette continued to complain of fatigue. These on-going complaints are confirmed by the records of Dr. Keller, Dr. Rubman and Dr. Siegel. Hence, the ALJ did not properly evaluate and explain the weight given to Goyette's medical source opinions of fatigue.

III. Credibility

Once the ALJ determines that the claimant has a severe impairment that could "reasonably be expected to produce . .

. symptoms . . . [the ALJ] must then evaluate the intensity and persistence of [the claimant's] symptoms . . . [to] determine how [the claimant's] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1). "[W]henever the individual's statements . . . are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  SSR 96-7P at *2.  "[W]hatever findings the ALJ makes must be consistent with the medical and other evidence. . . . [A]n ALJ must assess subjective evidence in light of objective medical facts and diagnoses."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988). The ALJ must consider the following factors to assess a claimant's credibility:

> (1) The individual's daily activities; (2) The location, duration, frequency and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; (7) Any other factors concerning the individual's functional

> limitations and restrictions due to pain or
> other symptoms.

SSR 96-7P at *3 (citing 404.1529(c)(1)).  The SSA also
advises adjudicators to consider (1) the consistency
(both internally and with the case record) of the
claimant's statements, (2) the objective medical evidence
of the symptoms, (3) the treatment history, (4) other
sources of information, (5) observations of the
individual, and (6) state agency findings. Id. at *5-*8.

At the hearing, Goyette testified that her ability
to work is significantly limited by her fatigue.  She
testified that she typically wakes up feeling fatigued
even after a regular night of sleep.  (Tr. 360-61).  She
reported taking several naps a day, sometimes after just
taking her son to school.  (Tr. 361).  Goyette testified
that on some days she sleeps all day.  (Tr. 361).
Sometimes, however, she has periods when she feels
better.  (Tr. 360).  She also testified that she can
drive, do grocery shopping or laundry, but only in very
small amounts.  (Tr. 362).

Goyette testified that after completing chemotherapy
for hepatitis, she returned to school and completed a
two-year Associate's Degree in four years.  (Tr. 371).

19

She also started working part time as an office assistant. (Tr. 365). She works one day a week for "four to five hours at the most." (Tr. 359). Goyette explained that after four hours she loses concentration and productivity. (Tr. 368-69). After work she naps before her son comes home from school. (Tr. 369). She also testified that she is starting another part time work assignment filming church services every other Monday for two hours. (Tr. 358-59).

The ALJ found Goyette's subjective complaints of disabling fatigue not fully credible because Goyette is able to care for her son, attend college, complete her degree, and do laundry. The ALJ also noted that Goyette has consistently performed part-time work since finishing chemotherapy.[4] The ALJ questioned Goyette's incentive to work because of the risk of losing public assistance.

Goyette argues that the ALJ's adverse credibility

---

[4]Goyette contests the Commissioner's submission of updated earnings record to reflect that she is still working. Goyette is correct that "[e]vidence not contained in the administrative record may not be considered when reviewing the findings of the Commissioner." Casiano v. Apfel, 39 F. Supp. 2d 326, 330-31 (S.D.N.Y. 1999)(citing Carnevale v. Gardner, 393 F.2d 889, 891 n.1 (2d Cir. 1968). Therefore this Court has not considered the updated earnings record submitted by the Commissioner with its motion to affirm the decision of the Commissioner (Doc. 15-1).

finding is not supported by substantial evidence.  This
Court agrees.  First, Goyette's complaints of fatigue are
consistent throughout the record and are consistent with her
impairments.  Moreover, in this Circuit a claimant's
ability to engage in limited activities of daily living is
not substantial evidence that a claimant can work.  Balsamo
v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (periodically
attending church, occasionally helping with shopping,
carrying a gun, owning and operating a motor vehicle);
Bischof v. Apfel, 65 F. Supp. 2d 140, 147 (E.D.N.Y.
1999)(shop and clean with help, limited driving, visiting
friends once a week).  Although Goyette testified to doing
more than the claimants in Balsamo or Bischof, the record
also shows that her activities were not equivalent to
"perform[ing] 'sustained work activities on a regular and
continuing basis,' defined as '8 hours a day, for 5 days a
week, or an equivalent work schedule.'"  Rinker v. Chater,
95 Civ. 3923, 1997 WL 47791 *7 (S.D.N.Y. Feb. 6, 1997)
(quoting SSR 96-8P, 1996 WL 374184, *2 (S.S.A.)); Draper v.
Barnhart, 425 F.3d 1127, 1131 (8th Cir. 2005).  Although
Goyette was attending school part time and working part
time, there is no evidence that she ever did either for more

than four or five hours in a day.  Hence, Goyette's ability
to engage in certain limited activities does not undermine
her testimony regarding the limiting effect of her fatigue.
Further, Goyette's account of her limited abilities was
confirmed by her mother and her employer.  Goyette's mother
testified that she did very limited house work that often
was interrupted by the need to rest.  (Tr. 375).  Goyette's
employer, Ms. Parsons, reported that Goyette works very few
hours, she limits her work assignments and that she can't
imagine Goyette in a competitive work environment.  (Tr.
191-92).

The ALJ also questioned Goyette's credibility because
she would lose public assistance if she worked.  Courts
disagree whether an ALJ can consider a claimant's financial
situation when determining the claimant's credibility.
Rinker, 1997 WL 47791 at *8 (comparing Winfrey v. Chater, 92
F.3d 1017, 1020 (10th Cir. 1996), Peters v. Shalala, No. 92-
cv-70173, 1993 WL 489234 (S.D. Iowa Sept. 23, 1993), Leggitt
v. Sullivan, 812 F. Supp. 1109, 1120 (D. Col. 1992),
Caldwell v. Sullivan, 736 F. Supp. 1076 (D. Kan 1990) which
question the propriety of considering income to Mullen v.
Bowen, 800 F.2d 535, 547 (6th Cir. 1986), Reyes v. Sullivan,

No. 91-cv-1467, 1991 WL 319031 (C.D. Cal. Dec. 3, 1991) which allow consideration of income)); see also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004)(affirming ALJ adverse credibility finding based in part on strong element of secondary gain).  The Rinker court decided that "the fact that an applicant for disability benefits receives other income which will be lost upon finding employment . . . by itself, does not mean that such an individual is less credible . . . ."  1997 WL 47791 at *9; see also Aronis v. Barnhart, No. 02 Civ. 7760, 2003 WL 22953167 (S.D.N.Y. Dec. 15, 2003)(finding that "the existence of a pending lawsuit [source of secondary gains] alone does not constitute the type of substantial evidence needed to discount a plaintiff's subjective complaints of pain.").  In this case, Goyette testified at the hearing that she receives state housing assistance, financial assistance and food stamps. (Tr. 362).  Goyette's attorney also noted during the hearing the possibility of a state program that allows single parents to work and retain benefits.  (Tr. 362).

As discussed above, Goyette's activities of daily living do not support the ALJ's credibility decision. Therefore, the only remaining evidence supporting the

decision is that Goyette might lose her benefits.  Without deciding whether a claimant's finances should ever be a factor in the ALJ's credibility determination, in this case Goyette's financial situation, without more, is not substantial evidence that supports the ALJ decision.

Therefore, in light of the relevant factors, the ALJ's decision to discredit Goyette's subjective complaints is not supported by substantial evidence.

IV.   Lay Witnesses

As noted above, among the relevant factors to be considered by the ALJ is the subjective testimony from the claimant or other sources.  <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983).  Other sources includes family and friends.  SSR 96-7P at *8; 20 C.F.R. § 404.1513(d)(4). At the hearing, the ALJ heard testimony from Goyette's mother.  She testified that Goyette rests and/or naps during or after attempting chores and/or after work.  (Tr. 375-76). Also, the administrative record includes a questionnaire completed by Goyette's employer, Pat Parsons.  (Tr. 191-92). Ms. Parsons reported that Goyette has low energy, and usually cannot work more than four hours.  Ms. Parsons claimed she "would find it difficult to picture [Goyette] in

a competitive 40 hour work week."   (Id.).

Goyette argues that the ALJ erred by not considering and/or explicitly rejecting this lay testimony.[5]  In her decision, the ALJ made no indication whether she considered any of this testimony other than to note that her findings were made "[a]fter careful review of the record."  (Tr. 19).  Although an ALJ need not mention or explain every piece of evidence in the record, this Court cannot glean from other portions of the decision why the ALJ rejected this evidence of Goyette's fatigue.  Mongeur, 722 F.2d at 1040.  Moreover, other courts have found that an ALJ errs by not acknowledging or explicitly rejecting relevant lay witness testimony.  Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)(finding ALJ erred by dismissing lay witness testimony without explanation); Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002)(same).  "If the ALJ wishes to discount the testimony of lay witness, [s]he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at 919.  Accordingly, this Court finds that the ALJ erred by

---

[5]Goyette relies on SSR 99-2P to support her argument.  That ruling clarifies the policies for evaluating claims based on Chronic Fatigue Syndrome ("CFS").  Goyette has not made a claim based on CFS.  Therefore, SSR 99-2P is inapposite.

failing to consider the testimony of Goyette's mother and employer.

## V.   Disposition

Goyette has asked this Court to reverse the Commissioner's decision and remand for the calculation of benefits.

Generally, if the Commissioner's decision is based on the wrong legal standard or an incomplete record this Court must remand the matter for reconsideration.   Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000).  However, a remand for the calculation of benefits is appropriate when the Commissioner fails to satisfy her burden of establishing with substantial evidence in the record that the claimant is capable of performing substantial gainful activity.   Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000).

As detailed above, the Commissioner has failed to meet her burden of showing that Goyette's ability to engage in substantial gainful activity has improved.  The ALJ improperly discounted the medical opinions of Dr. Rubman and Dr. Keller, improperly discounted the credibility of Goyette's subjective complaints, and did not consider

26

relevant and uncontradicted lay testimony.

"Where the existing record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no further purpose, a remand for calculation of benefits is appropriate." Martinez v. Barnhart, 262 F. Supp. 2d 40, 49 (W.D.N.Y. 2003); see also, Curry, 209 F.3d at 124 (remanding for the sole purpose of calculating an award of benefits where Commissioner failed to prove that plaintiff could perform other work and application had been pending more than six years); Balsamo, 142 F.3d at 82 (remanding for benefits based on errors at step five where application had been pending for four years); Huhta v. Barnhart, 328 F. Supp. 2d 377, 387 (W.D.N.Y. 2004) (remanding solely for calculation of benefits where ALJ's error was in interpreting and weighing the treating physician's opinions, not in failing to develop a more complete record and application had been pending for nine years). Accordingly, because the Commissioner failed to meet her burden based on a seemingly complete administrative record and this application has been pending for over nine years, this Court finds that a remand for the calculation of benefits is appropriate.

## CONCLUSION

For the reasons set forth above, this Court finds that the ALJ's decision is not supported by substantial evidence and the Commissioner's decision must be reversed and remanded for the calculation of benefits. Accordingly, Goyette's motion to reverse is GRANTED and the Commissioner's motion to affirm is DENIED.

Dated at Burlington, in the District of Vermont, this 26th day of May, 2006.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

28